**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL BOBO, et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23-cv-05639 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| SENTECH SERVICES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Michael Bobo and Johnny Parker have brought this putative class action against Defendants Sentech Services, Inc. ("Sentech") and UPS Mail Innovations, Inc. ("UPS"), alleging violations of the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq*., the Illinois Day and Temporary Labor Services Act ("IDTLSA"), 820 ILCS 175/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 et *seq*., based on allegedly unlawful pay practices at the UPS warehouse in Bensenville, Illinois. In a separate ruling, this Court granted a motion by UPS to compel Bobo to arbitrate his claims against it but denied a similar motion by Sentech. As a result, Bobo's claims against UPS are stayed pending arbitration. Now before the Court are UPS's motion to dismiss Parker's claims (Dkt. No. 46) and Sentech's motion to dismiss Parker's and Bobo's claims (Dkt. No. 50), both pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motions are granted in part and denied in part.

**BACKGROUND**

For purposes of deciding the motion to dismiss, the Court accepts as true the facts in the First Amended Complaint ("FAC") and views them in the light most favorable to Plaintiffs as

the non-moving parties. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The FAC alleges as follows.

Plaintiffs were jointly employed by Sentech, a staffing agency that supplies laborers to client companies, and UPS, a package delivery company. (FAC ¶¶ 9–12, 19, 22, 39, Dkt. No. 34.) Sentech assigned Plaintiffs to work at UPS's Bensenville warehouse. (*Id.* ¶ 24.) Bobo worked at the Bensenville warehouse during two separate periods: from March 2021 to May 2021, and again from June 2022 to May 2023. (*Id.* ¶ 26.) Parker worked there from September 2022 to June 2023. (*Id.* ¶ 27.) Plaintiffs performed tasks directly related to UPS's package delivery operations, including loading conveyor lines, inspecting and processing packages, and weighing and wrapping boxes. (*Id.* ¶¶ 30–31.)

According to Plaintiffs, when working at the Bensenville warehouse, they were regularly required to arrive one to two hours before their scheduled shifts but were prohibited from clocking in upon arrival. (*Id.* ¶¶ 50–51.) On some occasions, they were not permitted to clock in at all and instead sent home without pay. (*Id.* ¶¶ 53–54.) Other times, Plaintiffs would be permitted to clock in and work, but then they would be dismissed before they had worked at least four hours and they received less than four hours of pay for those abbreviated shifts. (*Id.* ¶ 55.) At the start and end of each shift, Plaintiffs were required to undergo security screenings but were not compensated for that time because they were not allowed to clock in before pre-shift screening and had to clock out before post-shift screening. (*Id.* ¶¶ 63–64.) Finally, when operating forklifts, Plaintiffs were paid $18 per hour despite being promised $19 per hour for that work. (*Id.* ¶¶ 67–69.)

As Bobo's claims against UPS are stayed pending arbitration, his remaining claims are now asserted solely against Sentech. Plaintiffs bring the following claims against Sentech: failure

to pay overtime wages in violation of the IMWL (Count I), failure to pay earned wages in violation of the IWPCA (Count II), quantum meruit (Count III), violation of the IDTLSA's four-hour minimum pay requirement (Count IV), failure to provide employment notices under the IDTLSA (Count V), and retaliatory discharge in violation of the IDTLSA (Counts VI). By himself, Parker asserts additional retaliatory discharge claims against both Defendants pursuant to the IMWL (Count VII) and the IWPCA (Count VIII). He also brings Counts III and VI against UPS and seeks to hold UPS liable under the IDTLSA for Sentech's violations of the IMWL and IWPCA alleged at Counts I and II.

## DISCUSSION

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). Together, Defendants' motions seek dismissal of all counts.

### I. Count I: Violation of the IMWL and IDTLSA – Overtime Wages

In Count I of the FAC, Plaintiffs allege that Sentech violated the IMWL by failing to compensate them for time spent waiting before their shifts and undergoing security screenings at the Bensenville warehouse. The IMWL requires employers to pay employees one and one-half times their regular hourly wage for hours worked in excess of forty hours a week. 820 ILCS 105/4(a)(1). Plaintiffs argue that the time they spent waiting to begin work and the time they

spent undergoing mandatory security screenings before and after work should count toward their total hours worked each week. Thus, for weeks in which they worked more than forty hours, Plaintiffs claim that they were unlawfully denied additional overtime pay. Parker further alleges that UPS is jointly liable under the IDTLSA, which holds third-party clients of staffing agencies liable for IMWL violations. 820 ILCS 175/85(b).

Defendants contend that the time attributable to Plaintiffs' pre- and post-shift activities is not compensable under the IMWL. Specifically, Defendants argue that because the IMWL's overtime provisions are interpreted in line with the equivalent provisions in the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C § 201, *et seq.*, the IMWL must be read as also incorporating the exclusions of the federal Portal-to-Portal Act of 1947 ("PPA"), 29 U.S.C. § 254(a)(2). The PPA amended the FLSA generally to exempt employers from liability for failing to pay overtime compensation for "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform; and (2) activities which are preliminary to or postliminary to said principal activity or activities." 29 U.S.C. § 254(a)(2). And the Supreme Court held in *Integrity Staffing Solutions, Inc. v. Busk*, that mandatory post-shift security screenings were not compensable under the PPA because they were not "'integral and indispensable' to the employees' duties as warehouse workers." 574 U.S. 27, 35 (2014).

At the time the motions to dismiss were being briefed, the question of whether the IMWL incorporated the PPA's exclusions for pre- and post-shift activities was unsettled. After the motions were fully briefed, the question came before the Seventh Circuit, which then certified the question to the Illinois Supreme Court. *Johnson v. Amazon.com Services LLC*, 142 F.4th 932, 944 (7th Cir. 2025). The Illinois Supreme Court answered the question in the negative and

further observed that, in light of the regulations promulgated by the Illinois Department of Labor, "'hours worked' . . . necessarily includes preliminary and postliminary activities" for purposes of the IMWL. *Johnson v. Amazon.com Services LLC*, 282 N.E.3d 464, 469–70 (Ill. 2026). That holding is fatal to Defendants' arguments for dismissing Count I—all of which are predicated on their claim that the IMWL incorporates the PPA's exclusions. Accordingly, Defendants' motions to dismiss Count I are denied.

## II. Count II: Violation of the IWPCA and IDTLSA – Failure to Pay All Earned Wages

In Count II, Plaintiffs allege that Sentech violated the IWPCA by (1) failing to pay them the agreed-upon hourly wage for forklift work and (2) withholding compensation for time spent waiting before shifts and undergoing security screenings. Parker additionally alleges that UPS is liable for any such violations under the IDTLSA, which holds third-party clients of staffing agencies liable for IWPCA violations. 820 ILCS 175/85(b).

The IWPCA does not establish a substantive right to overtime pay or any other kind of wage; instead, it provides a mechanism for employees to recover compensation owed under an employment contract or agreement. *Dominguez v. Micro Ctr. Sales Corp.*, No. 11 C 8202, 2012 WL 1719793, at *1 (N.D. Ill. May 15, 2012); *Brown v. Club Assist Rd. Serv. U.S., Inc.*, No. 12 CV 5710, 2013 WL 5304100, at *8 (N.D. Ill. Sept. 19, 2013). Under the IWPCA, the term "agreement" is broader than a formal contract and requires only a manifestation of mutual assent to terms of compensation. *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir.2012); *Zabinsky v. Gelber Grp., Inc.*, 807 N.E.2d 666, 671 (Ill. App. Ct. 2004).

Defendants argue that Plaintiffs fail to plead the existence of any contract or agreement to support their claims for unpaid waiting and screening time. The Court disagrees. The FAC alleges that Defendants agreed to pay Plaintiffs at an hourly rate for the work performed. (FAC

¶¶ 66, 72, 113.) And it is plausible that compensable work under that agreement includes the time Plaintiffs spent waiting to begin work and going through screening. *See Cortez v. Target Corp.*, No. 23-cv-01435, 2023 WL 11885235, at *3 (N.D. Ill. May 31, 2023) (finding that the plaintiff's allegations of an agreement to pay an hourly rate for his work was sufficient to state an IWPCA claim for unpaid security screening time). That conclusion is reinforced by the Illinois Supreme Court's decision in *Johnson* finding that "hours worked" encompasses preliminary and postliminary activities. 282 N.E.3d at 469. Although the Illinois Supreme Court was discussing "hours worked" in the IMWL context, this Court does not see any reason why the concept should be understood differently in the IWPCA context, at least at the motion-to-dismiss stage.

Similarly unavailing is Defendants' contention that there was no agreement as to the disputed forklift wage. The FAC adequately alleges an agreement regarding the hourly wage for forklift work. And Plaintiffs assert that Sentech paid them $18 per hour instead of the agreed $19 per hour for time performed as a forklift operator. Considering the broad definition of "agreement" under Illinois law, Plaintiffs have adequately alleged the existence of an agreement as to the forklift wage.

Accordingly, Plaintiffs' IWPCA claims and Parker's IDTLSA claim may proceed as to uncompensated waiting and screening time and the disputed forklift wage agreement.

### III. Count III: Quantum Meruit

In Count III, Plaintiffs plead quantum meruit as an alternative to their IWPCA claim, seeking compensation for the time they spent waiting before shifts and undergoing mandatory security screenings. Plaintiffs argue that Defendants knowingly accepted those unpaid services and unjustly received a benefit at Plaintiffs' expense. To state a valid quantum meruit claim,

Plaintiffs must show that: (1) they performed a service to benefit Defendants; (2) they performed this service non-gratuitously; (3) Defendants accepted this service; and (4) no contract existed to prescribe payment of this service. *Sys. Dev. Integration, LLC v. Comput. Scis. Corp.*, 739 F. Supp. 2d 1063, 1086 (N.D. Ill. 2010). Defendants contend that Plaintiffs' quantum meruit claim is merely derivative of their IWPCA claim, which fails as a matter of law. With the Court having now found that Plaintiffs have stated the related IWPCA claim, Defendants' argument that the quantum meruit claim falls with the IWPCA claim is unavailing.

**IV. Count IV: Violation of IDTLSA – Four-Hour Minimum Pay**

In Count IV, Plaintiffs allege that Sentech violated § 30(g) of the IDTLSA by failing to pay them a minimum of four hours' wages on days when they were contracted to work at the Bensenville warehouse but were not utilized for at least four hours. The FAC details several such instances: Bobo was paid for only thirty minutes of work for one week (FAC ¶ 56), and received no pay at all one day (*id.* ¶ 58); Parker was only paid for three hours of work one week (*id.* ¶ 59). Section 30(g) of the IDTLSA states that a temporary laborer assigned to work at a client site must receive a minimum of four hours of pay at the agreed upon rate if he "is not utilized by the third-party client." 820 ILCS 175/30(g).

Interpreting the statute literally, Sentech argues that the IDTLSA does not require it to pay Plaintiffs for a full four hours unless they performed no work at all. However, this same argument has been rejected by at least one other court in this District. In *Hoffman v. RoadLink Workforce Solutions, LLC*, the district court adopted a reading of the statutory text consistent with the statute's remedial purpose. No. 12 C 7323, 2014 WL 3808938, at *7 (N.D. Ill. Aug. 1, 2014). It therefore concluded that § 30(g) applies not only when a laborer performs no work, but also when the laborer works less than four hours after being dispatched. *Id.* Sentech urges the

Court against following *Hoffman*, arguing that the statutory language is clear and unambiguous, and thus should not be expanded beyond its plain terms.

As the *Hoffman* court observed, "[u]nder *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938), a federal court interpreting an Illinois statute must apply the rules of statutory construction applicable under Illinois law." *Hoffman*, 2014 WL 3808938, at *6. Under those rules, the primary goal is to "ascertain and give effect to the intention of the legislature," with the language of the statute providing the best indication of that intent. *Id.* at *7 (quoting *U.S. Fire. Ins. Co. v. Barker Car Rental*, 132 F.3d 1153, 1156 (7th Cir. 1997)). But where "the meaning of a statute is unclear from the statutory language itself, a court may look beyond the language employed and consider the purpose of the law and the evils the law was designed to remedy." *U.S. Fire. Ins.*, 132 F.3d at 1157 (quoting *In re Application for Judgment & Sale of Delinquent Props. for Tax Year 1989*, 656 N.E.2d 1049, 1053 (Ill. 1995)). Here, the Court believes that the phrase "not utilized" is reasonably susceptible to multiple interpretations. Taken literally, it could mean that the worker performed no work at all but it could plausibly encompass workers who were used for less than a full shift. Yet the former interpretation would lead to absurd results. *See, e.g.*, *Stewart v. Indus. Comm'n*, 504 N.E.2d 84, 86 (Ill. 1987) ("In construing a statute, the court must assume that the legislature did not intend an absurd result."). For example, a worker sent home without performing any labor would be entitled to four hours' pay whereas a worker assigned for five minutes would receive only five minutes of compensation. Such an outcome would be contrary to the IDTLSA's stated purpose of "protect[ing] the labor and employment rights" of low-wage day or temporary laborers. 820 ILCS 175/2.

In line with *Hoffman* and the statute's remedial intent, the Court concludes that § 30(g) must be read to cover workers who are underutilized, not just those who are entirely unutilized.

Any other reading creates a loophole large enough to gut the statute's protections. Temporary workers lack control over their schedules and assignments; the four-hour pay guarantee ensures that employers cannot exploit that imbalance by assigning trivial tasks before sending workers home with negligible compensation.

Sentech also points to a related clause in § 30(g), which states that if a laborer is contracted to work at another location during the same shift, the agency must pay at least two hours of wages. But this provision does not limit the four-hour minimum obligation; rather, it provides an exception in cases where the worker is reassigned. Plaintiffs do not allege that such reassignment occurred, but the FAC does indicate that Plaintiffs were not even paid the reduced two-hour minimum. Thus, this clause does not bar Plaintiffs' claims.

Because Sentech's reading of the statute defies both common sense and the IDTLSA's remedial purpose, and because Plaintiffs plausibly allege violations of § 30(g), Sentech's motion to dismiss Count IV is denied.

**V. Count V: Violation of IDTLSA – Employment Notice**

In Count V, Plaintiffs allege that Sentech violated the IDTLSA by failing to provide them with proper employment notices. Specifically, they claim that Sentech both changed their hourly wage without providing updated written notices and failed to issue employment notices at dispatch or when material terms changed. Plaintiffs further assert that Sentech's failure to provide these notices prevented them from tracking and accounting for all earned wages, including minimum wages, overtime, and other compensation.

Under § 10 of the IDTLSA, temporary labor service agencies are required to provide workers, at the time of dispatch, with a written statement containing key terms of employment, including: the name and nature of the work; required equipment, protective clothing, and

training; the wages offered; the destination and transportation terms; and information about meals or equipment provided and associated costs. 820 ILCS 175/10. To state a claim under this provision, a plaintiff must allege that either no employment notice was provided or that the notice was deficient in one or more material aspects.

Sentech argues that Plaintiffs' allegations are too vague and conclusory to state a claim. Specifically, it contends that Plaintiffs do not identify what information was omitted or whether an employment notice—albeit a deficient one—was issued at all. Plaintiffs counter that they have pleaded sufficient factual detail to give Sentech fair notice of the claim.

While the FAC does not enumerate specific instances of non-compliance, the Court finds that it plausibly alleges a recurring failure to provide required notices—particularly when wages changed. (FAC ¶ 75, 147.) Plaintiffs' allegations sufficiently place Sentech on notice of the nature of the alleged violation, and any further dispute over the adequacy of the notices provided is a factual question inappropriate for resolution at this stage in the proceedings.

Accordingly, Sentech's motion to dismiss Count V is denied.

**VI. Counts VI and VIII: Retaliatory Discharge**

The FAC asserts retaliatory discharge claims under the IDTLSA (Count VI), the IMWL (Count VII), and the IWPCA (Count VIII). In their response brief, Plaintiffs state that they do not contest the dismissal of the IMWL claim. And because courts have found that there is no private right of action for retaliatory discharge under the IMWL, the Court dismisses Count VII with prejudice. *E.g.*, *Hughes v. Scarlett's G.P., Inc.*, No. 15-cv-5546, 2016 WL 454348, at *8 (N.D. Ill. Feb. 5, 2016).

Both the IWPCA and the IDTLSA protect employees from discharging or otherwise discriminating against employees for asserting their rights under the laws, including making

complaints about wage violations. 820 ILCS 115/14(c); 820 ILCS 175/90. Although there is limited case law interpreting these provisions, the Illinois Department of Labor's Emergency Amendment to the IDTLSA provides guidance. It defines "retaliate" to include actions such as "reprimand, discharge, suspend, demote, deny an assignment, make a materially adverse change to the terms or conditions of the laborer's work, or take any adverse action against the laborer because of the laborer's involvement in protected activities." Ill. Adm. Code tit. 56, § 260. This language tracks Title VII's retaliation framework, under which courts consider whether a plaintiff's involvement in protected activity caused him to suffer a materially adverse employment action. *E.g.*, *Lesiv v. Ill. Cent. R.R. Co*., 39 F.4th 903, 911 (7th Cir. 2022).

**A. Bobo**

Bobo asserts his retaliatory discharge claim only under the IDTLSA. He alleges that he complained to Sentech management about its pay practices on May 8, 2023, hand-delivered a copy of his complaint on May 10, 2023, and received a text message on May 19, 2023, informing him that Defendants were ending his job assignment. (FAC ¶¶ 154–58.)

Sentech responds that Bobo's statements are too barebones to establish a causal connection between his complaint and his termination. It notes that the FAC does not allege any facts tying Bobo's complaint to its decision to end his assignment. Ultimately, to prevail on his retaliatory discharge claim, Bobo will likely need to come forward with evidence showing something more than just suspicious timing. *Cf. Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012) ("It is well established that mere temporal proximity between [the activity protected under Title VII] and the action alleged to have been taken in retaliation for that activity will rarely be sufficient in and of itself to create a triable issue." (internal quotation marks omitted)). However, at the pleading stage, the temporal proximity between Bobo's complaint and

his termination suffices to allege a causal link between the protected activity and an adverse action. *Cf. Armstead v. Valley View Sch. Dist.*, No. 23 CV 3312, 2024 WL 1530472, at *4 (N.D. Ill. Apr. 9, 2024) (concluding that the plaintiff had stated a Title VII retaliation claim because "[h]er allegations that her mistreatment occurred simultaneously with her complaints of discrimination support a reasonable inference of causation").

**B. Parker**

Parker alleges retaliatory discharge against Defendants under the IDTLSA and the IWPCA. Parker's allegations for retaliatory discharge consist of the following: he informed a Sentech manager in May 2023 that he would bring a class action lawsuit, stopped working in June 2023, filed his lawsuit on July 5, 2023, and was told on July 31, 2023, that he was not allowed to return to work—even though Sentech routinely allows temporary workers to take breaks in their employment and return to work. (FAC, ¶¶ 160–69.)

Sentech argues that Parker's claim is more appropriately framed as a failure-to-hire claim, which requires plaintiff to show, among other things, that he applied and had the technical qualifications required for the position. *Oliver v. Joint Logistics Managers, Inc*., 893 F.3d 408, 413 (7th Cir. 2018). Yet, according to Sentech, Parker fails to allege that he applied for and was qualified for the position. Once again, Sentech demands too much at the motion-to-dismiss stage. While the FAC does not allege that Parker filed a formal application for reemployment, it does state that he contacted Sentech about returning to work and was told that he would not be rehired. The Court declines to find that the asserted retaliation claims nonetheless demand that Parker submit an application knowing it would be futile. As to Parker's qualifications for the work, the FAC pleads that Sentech "routinely allows" workers to return after breaks in employment. And it can be reasonably inferred that Parker was qualified to perform the same

work he had previously performed for Sentech without incident. Finally, that Sentech informed Parker that he would not be permitted to return to work less than a month after he filed his lawsuit makes it plausible that Parker's protected activity was a motivating factor for Sentech's refusal. Consequently, Sentech's motion to dismiss Parker's retaliation claims is denied.

With respect to UPS, it contends that Parker's claim fails because he does not allege that it had any role in hiring, firing, or reinstating him. Here, the FAC alleges that UPS and Sentech were joint employers of Parker. Determining whether a defendant is a joint employer of an employee involves an assessment of factors including "the putative joint employer's role in hiring and firing; promotions and demotions; setting wages, work hours, and other terms and conditions of employment; discipline; and actual day-to-day supervision and direction of employees on the job." *Kim v. StoneX Grp. Inc.*, No. 22-cv-02392, 2022 WL 17082574, at *2 (N.D. Ill. Nov. 18, 2022) (quoting *Andrews v. Kowa Printing Corp.*, 838 N.E.2d 894, 904 (Ill. 2005)). While the FAC does not expressly allege that UPS had hiring and firing authority over warehouse employees, it does detail other ways in which UPS exercised control over working conditions at the Bensenville warehouse. (FAC ¶¶ 32–40.) Those allegations of UPS's control are enough to allow Parker to proceed to discovery with respect to his retaliation claims against it. *See, e.g.*, *Kim*, 2022 WL 17082574, at *3 ("The existence of these relatively complex, multi-factor tests implies that the question of joint employment requires a fact-intensive inquiry that typically requires further development through discovery." (internal quotation marks omitted)). The Court therefore denies UPS's motion to dismiss Parker's retaliation claims.

**CONCLUSION**

For the reasons stated above, UPS's motion to dismiss Parker's claims (Dkt. No. 46) and Sentech's motion to dismiss both Plaintiffs' claims (Dkt. No. 50) each are granted in part and

denied in part. Count VII of the FAC is dismissed with prejudice. The motions are otherwise denied.

ENTERED:

Dated: September 30, 2026

Andrea R. Wood
United States District Judge